Johnson J.
This association was incorporated September 1, 1880. The record of the company shows that seven persons, to wit, D. R. Johnston, W. H. Carter, J. B. Netseher, Jerry Shank, Geo. W. Cole, S. W. Anderson and John F. Wood, met on that day in Mansfield for the purpose, as is stated, of organizing an association “ to furnish mutual protection and relief to its members,” under section 3630 of the Revised Statutes; Mr. Anderson was made chairman of the meeting, and he thereupon presented a plan of operations, which was unanimously adopted. What that plan was, does not appear from the record of the company, but is subsequently disclosed in the proceedings and acts of the association.
At the same meeting, those present drew up, and five of them executed, articles .of incorporation, which were subsequently authenticated and filed with the secretary of state, under which they became a body corporate.
Before adjourning, and of course before they had become incorporated, these seven persons proceeded to elect themselves “officers and trustees” of the association fqr one year, giving to each an office, and also appointed an executive committee from among themselves. It appears that by-laws were also adopted, but the record of the trustees is silent as to their provisions. This record and the books of the association show they proceeded to transact business as a corporation soon after.
The certificate of incorporation, after stating the name and place of business, states the purpose of the association to be, “ to receive money, either by voluntary donation, or contribution, or to collect the same by assessment of its members, and to distribute and appropriate the same to the families or heirs of its deceased members, in such manner as may be prescribed by the rules and regulations of the association, not inconsistent with the laws of Ohio, and so as to carry out the objects and purposes of the association as above expressed.” The section of the Revised Statutes authorizing such a corporation is as follows:
“ Seo. 3630. A company or association may be organized for the mutual protection and relief of its members, and for *287 the payment of stipulated sums of money to the families or heirs of the deceased members of such company or association, and may receive money, either by voluntary donation or con-, tribution, or collect the same by assessment on its members, and may distribute, invest and appropriate the same in such manner as it may deem proper; but the aggregate sum stipulated to be paid to the family or heirs of any member at his decease shall in no case exceed seven thousand dollars, nor shall any assessment on account of the death of any member be made against any surviving member exceeding one-fifth of one per centum stipulated to be paid to such survivor at his decease ; and such association shall not be subject to the proceeding sections of this chapter.”
It will be noticed that this section authorizes such corporation for the mutual protection and relief of its members, and also for the payment of stipulated sums of money to the family or heirs of deceased members. The certificate of incorporation is silent as to furnishing mutual protection and relief to members. It limits the scheme, so far as relief is concerned, to the distribution of its funds to the family or heirs of deceased members.
It does not purport, therefore, to afford any relief or protection to its members, but only to provide for their family or heirs after their decease. It is in no sense, therefore, according to the charter, a mutual aid association to members, but a mutual insurance company of members, for the benefit of the family or heirs of members.
It has issued what are termed certificates of membership, but the real nature of the contract is that of insurance.
The so-called member, for in fact he is not treated as a' member of the corporate body, contracts to pay an admission fee, and annual dues of specified amounts, and a stated assessment for each death in the class to which he belongs, in consideration of which, the company agrees to pay his beneficiary named the assessment collected (less the deductions stated hereafter), not exceeding the amount of insurance named in the certificate, which is either $2,000 or $3,000.
In Commonwealth v. Wetherbe, 105 Mass. 119, it was held, *288 that such a contract was one of insurance, whatever be the terms of payment of the consideration by the assured, or the mode of payment of the sum to be paid in the event of loss, and although the object of the insurer, in making the contract, is benevolent and not speculative.
It was further held in that case that it was none the less a contract of mutual insurance because the amount to be paid is not a gross sum, but one graduated by the number of members, nor because a portion of the premiums are to be paid upon uncertain periods of the death of members, nor because in case of non-payment of assessments the contract provides no mode of enforcing payment thereof, but merely declares the contract forfeited.
From the specific terms of the charter, as well as from the tenor of certificates of membership, the contract entered into is one of insurance on the lives of members, and not one for the mutual protection and relief of its members.
Whether it is competent to become a corporation for that single purpose when the statute authorizes such corporations for the double purpose of mutual protection and relief of its members, and also for life insurance for the benefit of the family or heirs of such members, is a question we need not now stop to answer, as the petition admits that the association was duly incorporated.
Section 3630 provides, however, that these corporations shall not be subject to the preceding sections of the chapter, relating to life insurance companies “ on the mutual or stock-plan.” Chapter 10, sections 3587 to 3629 Rev. Stat.
This leads to the inquiry, to what extent they are regulated by law, and to what extent such associations may adopt their own rules and regulations %
Though not subject to the provisions relating to life insurance in chapter 10, they are subject to the general provisions relating to corporations found in chapter 1 of title 11 of the Revised Statutes.
That chapter provides for two classes of corporations, (1) those for jprofit which must have a capital stock, and (2) those not for profit, which need not have such capital stock.
*289 If it is of the first kind, its name must begin with ££ The,” and end with “ Company,” and in eacli kind the place of business and purpose for which it is formed must be stated in the certificate. R. S. § 3226. By section 3240, a majority of the'subscribers to the articles of incorporation of a corporation, other than for profit, may elect not less than five trustees, who shall hold their offices till the. next eléction, or until their successors are elected and qualified. In the case at bar, the incorporators elected seven trustees for one y.ear.
By section 3246, unless the regulations otherwise provide the annual election for trustees or directors shall be held (this section applies as well to corporations not for profit as those for profit), on the first Monday in January of each year. It further contemplates that the elective body consists of the ££ members ” of the corporation in those not for profit, and the “ stockholders,” in those for profit.
Section 3249, provides that every corporation may adopt a code of regulations for its government, not inconsistent with the laws of this state.
Section 3250, authorizes the trustees, or directors of a corporation, to adopt a code of "by-laws for their government, not inconsistent with the regulations of the corporation, or the constitution' and laws of the state, and may change them at pleasure; but section 3251 requires that regulations may be adopted or changed by the assent in writing of two-thirds of the stockholders, or, if there is no capital stock, of the members, or by a majority of the stockholders or members at a meeting held for that purpose,- of which due notice is given.
By section 3252, a corporation, by its regulations, when no other provision is specially made in this title, may provide, 1st. Eor the time, place, &c., of meetings; 2d. The number of stockholders, or members, to ’ make a quorum; 3d. The time for the election of trustees or directors; 4th. The duties and compensation of officers; 5th. The mode of filling, and tenure of all offices, other than trustees or directors; and 6th. The qualification of members, when the corporation is not for profit.
*290 By section 3261, the trustees of corporations, other than for profit, are made personally liable for all debts by them contracted.
These are the chief provisions of the statute relating to corporations other than for profit.
We are of opinion, 1st. That associations incorporated for the purposes named in section 3630, are corporations other than for profit, and hence any plan or scheme which is intended to earn profits for its trustees managers or agents, is in violation of law.
2d. That the members of such a corporation, and not the incorporators nor the first board of trustees, elected by them, are the elective body. These members, and not the trustees or incorporators, are authorized to elect trustees, and adopt regulations for the government of the corporation, in the transaction of its business. Hence the trustees are the chosen agents of the members. They have no authority to adopt or alter regulations, nor to prescribe their terms of office, though they may make by-laws for their government and change them at pleasure.
The facts in this case show, that this association has been .organized, and is doing business in direct violation of these provisions of law.
I. The members of the corporation have had no voice in the election of trustees or in the management of its affairs. The incorporators, at the first, meeting to organize, elected themselves trustees for one year. At the end of that year these same trustees re-elected themselves; the meeting, as the record shows, was the annual meeting of the trustees, and all being present.
On January 25, 1882, they adopted a new code of “bylaws, rules and regulations by which they provided, that they should hold office d/wri/ng Ufe, and in case of vacancy by death or resignation, or x’emoval for good cause, which could be done by a majority vote, such vacancy should be filled by the remaining trustees. Thxxs they arrogated to themselves all authority. They made regulations, and conducted the whole bxxsiness, on the theox-y that the members had no voice. They *291 were under no obligations, to become members, and most of them were not.
They thus became a perpetual body, invested with all the franchises and powers which the statute vested in the members.
II. The plan upon which the business has been done, was to make money for these trustees and their agents.
These self-constituted trustees clothed themselves with supreme and perpetual power and then proceeded to manage this self-imposed trust for their own interest, and at the expense of their over-confiding members or thei'r speculative beneficiaries. I am aware this is a serious charge, but it is not made without the most convincing evidence taken from the books and papers of the company.
The statute contemplates the organization of associations for mutual protection and relief of members, and for the payment of stipulated sums to the family or heirs, of its deceased members. They are authorized to receive donations and voluntary contributions for such relief and protection, also to raise by assessment of its members sums of money to be appropriated to the family or heirs of a deceased member. By the table of rates, and under the pretense that they were providing for the necessary and reasonable expenses of administering the trust, they have collected from the so-called members, by assessment and otherwise, or, quite as often, from some beneficiary, having no insurable interest in'such member but who is induced by speculation, large sums of money, beyond the amount that was paid, to the family or heirs, or that is required to pay the expenses of the trust. From the date of organization, September 1, 1880, to-April 15, 1882, the association received the following sums from members, or specula-' tive beneficiaries.
Admission fees,........$11,829 26
Annual dues, “ Expense fund,” . . . 12,035 00
Death assessments collected, .... 75,928 05
Weekly benefit fund,...... 90 00
Total receipts, $99,882 31
*292 From .this there has been paid to beneficiaries, ............$29,289 56
Add assessments not due, to be paid to beneficiaries,..........24,439 00
Amount of assessments returned to members, ....... 1,457 20
Total disbursed to members, and beneficiaries . out of assessments,........ 55,18576
Leaving balance for “ expenses,” .... $44,696 55
The above $99,882.31 paid by members, is exclusive of amounts which they paid to agents, as admission fees, and which they retained as commissions. These admission or membership fees, as appears by the table of rates, were from $12 to $25, according to age and amount of insurance. From a statement taken from the books of the company it appears that 5,552 members have been admitted, classified thus:
Preferred Division, age 20 to 60, 1st class Hazardous Division, age 61 to 70, $3,000 2,000 policy 259 301 u
2d “ “ ’ “ “ “ 3,000 827 u
1st “ Extra “ “ 71 to 80 2,000 1,029 u
2d “ “ “ ' “ “ 3,000 2,062 a
1st “ .Special “ “ 81 to 86 2,000 510 u
2d “ “ “ “ “. 8,000 565 u
Assuming that the agents collected the full amount of membership fee, authorized in each case, it amounts to,......... ,955 00
From this deduct the amount paid the company as per above statement,........ 11,829 26
Amount paid by members and retained by agents, $73,125 74
Add amount received by the company, as above, 99,882 31
Total amount paid by members, . . . . $173,008 05
*293 Thus the $55,185.76 which was appropriated plated by the statute, cost the members or their beneficiaries $173,008.05. as contemspeculative
Of the $44,696.55, which came into the hands of .the association there was, expenses, . . . $7,662 83
Paid for collections,........• . . 7,712 75
To J. B. Netscher, President,...... 2,188 49
Jerry Shunk, Treasurer (resigned), . . . 140 00
Geo. W. Cole, “ (successor to Shunk) 1,938 49
J. W. Craig, Medical Examiner,..... 2,291 49
W. H. Carter, Secretary,...... 7.173 49
S. W. Anderson, Managing Agent, . . . 7.173 49
Other salaries,.......... 3,025 50
Total salaries,...........$23,931 15
That these so-called salaries were only .so in name, and a mere device, in lieu of a division of profits, is plain.
There is a by-law which provides that the “ expense fund ” shall be created by the payment of membership fees, annual dues, and “ any residue left of an assessment after payment of beneficiary claims,” and that it shall he used in defraying expenses and salaries of officers, and “ any other claim that shall receive the approval of the executive committee.”
The temptation to increase the residue of an assessment by settling with the beneficiary at the lowest possible figure, is very great, and the power of the executive committee over this fund to pay “ any other claim, than expenses and salaries ” (what other legitimate claim there could he is hard to imagine), is too great to secure the faithful administration of a trust, and so the sequel proves.
Another device to create an expense fund appears from the books.
The certificates of membership, as they were originally issued, expressed on their face, that 20 per cent, collected on death assessments was to be deducted to pay the expense of' collection. This caused complaint, owing, as the minutes show, “ to a wrong construction,” so it was struck out, and the by *294 law was so amended as to provide that the beneficiary should receive $3 for each member that paid his assessment not exceeding the amount of the policy.- New certificates, with the 20 per cent, clause struck out, were ordered to be issued in lieu of the old ones.
How this change served to allay complaints and increase the expense fund at the same time, appears from two cases, taken at random from the books, one before and one after the change. February 8, 1881, a certificate pf membership on the life of Hannah Lowe, for $3,000 in the extra hazardous class, was issued, loss payable to her nephew, by name. She died within thirty days.
The death assessment realized,.......$397 25
20 per cent was deducted for the expense fund, . . 79 45
Balance paid to the nephew,........$317 80
After this change in the by-laws, Sarah Getz, a member, died.
The death assessment realized,.......$1,616 90
Per centage deducted, over 30 per cent., was, . . 488 90
Balance paid to beneficiary,.......$1,128 00
I have examined numerous entries on the books showing that over thirty per cent, has been deducted from death assessments which were collected of members. It is no surprise, therefore, that about 45 per cent, of the amount received by the company went to other purposes than for the benefit of the family and heirs of members, or that $55,000 of insurance received by members cost them $173,000.
As before stated, the sum collected on death assessments was,.............$75,928 05
The amount paid to beneficiaries and members, . 55,185 76
Excess of assessments collected over amount paid, $20,742 29
*295 When we remember that there had been collected from admission fees, $11,829.60, from annual dues $12,035.00, making an aggregate of $23,054.16 to the credit of the “ expense fund,” a sum surely large enough to defray the expenses of this association if the trust had been faithfully and economically managed, we can but declare, that this deduction of thirty per cent, to increase that fund was a gross breach of. trust.
That the exorbitant sums which the trustees voted to themselves, with such unanimity, as the record shows, were not in fact by way of compensation for services rendered, but rather as a division of this illegal gain, appears from the books and records of the association. The compensation or salary of the trustees was not prescribed by any by-law or regulation, but was left to be fixed by themselves from time to time.
The ledger shows the salaries paid up to September 1, 1881, at a much lower rate than afterwards. In January, 1882, the following salaries from September 1881, to February 1, 1882, were allowed and paid :
J. B. Netscher, Pres’t, 5 mos. at $100, .... $500.00'
G. W: Cole, Treasurer, 5 mos. at $50, .... 250.00.
J. W. Craig, Med. Ex., 5 mos. at $25, $125 00
3,282 examinations of appl. at 10 cts., 282 20
- 407' 20
"W. H. Carter, Sec’y, 5 mos. at $300 per mo., . . 1,500 00
S. W. Anderson, “ “ “ . . 1,500 00
Total,..........$4,1.57. 20
At the same time they unanimously voted themselves $873.49 each as “ additional salaries for services rendered,’’'equal to $4,367.45. Their respective salaries for the remaining seven months of the year was fixed at $100 per month for the president, vice-president and treasurer, an increase of lOCIper cent, over preceding five months, and $300 per month for the secretary and general manager. .They were paid at these rates for February and March, and on March 30,1882, they again voted *296 themselves an addition thereto of $600 each, which was paid, as follows:
J. B. Netscher, Pres’t, 2 mos salary, $200 .
additional salary, . 600 equal to $800
Gr. W. Cole, Treas., . . , 200
additional salary, . . 600 “ 800
J. W. Craig, Med. Ex’r, 200
additional salary, . . 600 “ 800
S. W. Anderson, Manager, . 600
additional salary, . . 600 “ 1,200
W: H. Carter, Secretary, 600
additional salary, . . 600 “ 1,200
Ain’t for two months’ services ($28,800 per year), $4,800
These “ additional salaries ” alone amounted to $1,473.49 for seven months, and the aggregate for these seven months was $13,324.65. As the “additional salaries” are voted equally to each trustee, without regard to regular salaries or to apparent services rendered, the conclusion is irresistible that it was a division of profits.
Thus in the form of “ salaries,” or “ additional salaries,” these trustees were exacting from members or beneficiaries to pay themselves at the rate of $22,842.24 per annum for the whole board, and at the rate of $5,440 per annum to the .secretary and general manager.
III. The plan upon which this association is conducted is ¡against public policy, leads to speculation or gambling on the lives of aged and infirm people, and is a deception and a fraud on those for whose benefit it is intended.
Although it was held in State ex rel. v. Central Ohio Mutual Relief Ass., 29 Ohio St. 399, that such associations were not authorized to issue certificates providing for the payment of money in case of death of a member to others than th.e family or heirs, yet this association has been continually engaged in such transactions, as the following statement will show.
In 236 cases “children” were named as beneficiaries; in *297 1,998 cases “sons;” in 967 “daughters;” in 33 “brothers;” in 22 “sisters;” in 60 “grandchildren;” in 146 “nieces;” in 375 “nephews;” in 313 “sons-in-law;” in 45 “heirs;” in 23 '“ estate;” in 167 “ self;” in 2 “ father;” in 42 “ cousins;” in 37 “ daughters-in-law;” in 27 “ step-sons;” in 59 no relation ; in others to brothers-in-law, sisters-in-law, executor, &c.
Again, the statute gives the right to assess members to raise the money to pay to the family or heirs of deceased members. In a large majority of cases, the beneficiaries or others were recognized by the company as the persons to pay such assessments; indeed it is not certain but that in some cases the member had no knowledge of the application made in his or her behalf. Memberships were issued indiscriminately, without regard to age or prospects of life. It is published in the circulars or “ leaflets,” which are distributed to the public, that “ applicants for membership in the Preferred Division,” (that is, between 20 and 60 years of age)- “ will be required to pass a thorough medical examination by some competent physician, and none but good risks will be accepted under any circumstances.”
Why no medical examination is required or was had in case of people over 60 years of age, is easy to understand in view of the scheme as carried out.
Yet the by-laws provide, that applicants must be of “ sound mind and body.”
The sincerity of this rule may well be doubted when a medical examination. is dispensed with. Memberships were issued to persons between 20 and 60 years of age inclusive, 259; from 60 to 70, 1,128; from 71 to 80, 3,091; from 81 to 86, 1,074; thus only 259 out of 5,552 members accepted, were subjected to any medical examination.
The applications on file show, that some if not many of them were at the time, and had been for years, not of sound body, and some died shortly after they were insured for the benefit of others than heirs or members of the family.
As a fact the agents of the company, the medical examiner of applications, the trustees and the beneficiaries, were each and all, under the plan adopted, directly interested in obtain *298 ing the worst risks possible to secure; an old and decrepit person “ with one foot in the grave ” and the other soon to follow, was a much more profitable member than a sound one.
In such a case at least eighty per cent, of the admission fee went to the agent, who could more readily earn it when no examination was required, and the balance .went to the “ expense fund.” The sure prospect of an early death, stimulated the affectionate regard of “ sons-in-law ” and others, not members of the family or heirs, to advance this fee, and assume the risk of paying death assessments that might happen before the subject of their insurance should die, when they would receive, in the shape of an assessment, their reward for having selected the most dangerous risk. The more risks of this kind, the more assessments out of which the trustees deducted from 20 to 30 per cent, to pay themselves large salaries and additional salaries. This is in violation of all sound principles of life insurance, the two material .elements of which are, the rates of mortality of its risks, and the expenses of management. It is essential to the success of all life insurance, and to the value of insurance to the policy holder, that these factors be reduced to the minimum by care in selecting risks and by economy of management, but in such a company as this, the nearer the grave the better the risk, those having a reasonable prospect of an early demise alone are wanted. As is said in a recent Report of the Commissioner of Insurance of Pennsylvania: “ This is worse than lotteries, faro tables and other forms of gambling, denounced as immoral and punished by fine and imprisonment. It is gambling in human life, and furnishes strong incentives to worse crimes. It is using the‘name of life insurance as a convenient cloak for lotteries, in which greedy gamblers cheat one another, with stakes upon the lives of venerable paupers.”
It does not fall within the province of the court to discuss the relative merits of the different plans of life insurance, as between the old line systems and those formed on the cooperative or mutual assessment plan. It is enough to know that the statutes of Ohio authorize each plan, and each doubtless has its merits if properly administered, and demerits if *299 not. "Whatever be the system, it is the highest duty of the courts to see that the trust is faithfully administered.
This is especially true in the co-operate or mutual assessment plan, where there is no reserve or surplus fund, and where the assessments to pay benefits are. collected directly from the members, who generally do not understand the mysteries of life insurance management.
These associations doubtless had their origin in the friendly and benevolent organizations and fraternities claiming like affiliation and purpose. These and other organizations, having for their object the mutual aid, benefit and relief of their members, or their families or heirs, when honestly and economically administered as a sacred trust, and not with a view to profit, are worthy the protection of law.
Beneficence and charity are justly claimed as cardinal graces, and should be fostered and encouraged; but the protection of the people from fraud and imposture, acting under the name of these virtues should meet with speedy condemnation.
Counsel for the corporation make an appeal to the court in behalf, it is said, of the 4,295 members, to spare the corporate life of the association and simply oust it of certain franchises which it has abused. In support of this it is said that these members have paid in their money, all of which they will lose if judgment of ouster as prayed for is entered. This assumes, among other things, that there is no individual liability of the trustees for their unauthorized acts. How this is we have not now to determine.
This is not the case of exceptional excess of corporate power. The whole plan of operations, and their practical exemplification, manifest a carefully formed purpose'to make money for the trustees. It is a speculative insurance company, in a most objectionable form. To prolong its existence and thus enable the trustees to continue in such business, would be a failure of duty on the part of the court.

Judgment of ouster.

Okey, C. J., took no part in the decision of this case.